**QUINTON STANLEY, Plaintiff/Counterclaim Defendant**

**v.**

**ERIC A. BROWNE, Defendant/Counterclaim Plaintiff**

Case No. SX-09-CV-602

Superior Court of the Virgin Islands

Division of St. Croix

April 30, 2015

BRADY, *Judge*

## MEMORANDUM OPINION

(April 30, 2015)

THIS MATTER came on for bench trial ("Trial") on September 4, 2014, and a Post-Trial Briefing Order was entered that date.

Plaintiff/Counterclaim Defendant Quinton Stanley's ("Plaintiff" or "Stanley") Post-Trial Memorandum was filed December 4, 2014. Defendant/Counterclaim Plaintiff Eric A. Browne ("Defendant" or "Browne") did not submit a post-trial brief.[1] For the reasons that follow, Judgment will enter in favor of Plaintiff directing Browne to remove any and all portions of his fence that encroach onto Stanley's property.

## BACKGROUND

Stanley filed his Verified Complaint on December 18, 2009 ("Complaint"), alleging that in 1998, Browne orally agreed that Defendant could erect a temporary fence encroaching on Plaintiff's property, located on Plot No. 293 L Estate Grove Place ("Property"). Complaint, at ¶5. Plaintiff further alleged that when he asked Defendant to remove the fence in September 2009, Defendant refused. *Id.* at ¶ 6. In his Answer and Counterclaim, filed April 19, 2010, Defendant alleged that the parties' agreement permitted Defendant to build a permanent wall, and that Plaintiff's demand that Defendant remove the wall constituted breach of contract. Answer and Counterclaim, at 2-3.

At Trial, Plaintiff, Defendant, and Kirtly Stanley[2] testified. At the conclusion of the Trial, Defendant made an oral "Rule 50 Motion,"[3] which the Court took under advisement. Based upon the Trial evidence and arguments of the parties, the merits of Plaintiff's Complaint and Defendant's Counterclaim are decided below.

## FINDINGS OF FACT

Defendant Browne lives at 293-I Estate Grove Place, St. Croix, consisting of approximately three-quarters of an acre, which he purchased in or about 1987. Tr. at 8. Shortly thereafter, Defendant built a house on

---

[1] Plaintiff is represented by Eszart A. Wynter, Sr., Esq. Defendant was represented at Trial by Emile A. Henderson, III, Esq. By Stipulation for Substitution of Counsel, filed December 31, 2014, granted by Order entered January 12, 2015, Yvette D. Ross-Edwards, Esq. became counsel for Defendant.

[2] "Kirtly Stanley" was also referred to as "Carl" throughout the Trial. *See* Trial Transcript (Tr.) at 37. Kirtly Stanley is the brother of Plaintiff.

[3] FED. R. CIV. P. 50, applicable per SUPER. CT. R. 7, relates to a motion seeking judgment as a matter of law following the presentation of evidence by the party bearing the burden of proof in a jury trial. Here, the oral motion was accepted as seeking entry of judgment in favor of Defendant for Plaintiff's failure to meet its burden of proof.

his property. Tr. at 8-9. The house was constructed entirely on Defendant's Plot 293-I, but too close to the northern boundary line with Plaintiff's adjoining Property, in violation of the applicable 10-foot setback,[4] and at one corner of the house, "it sort of meets it." Tr. at 9-10.[5] Defendant first realized that his house did not comply with the 10-foot setback requirement after Hurricane Hugo, when he planned to erect a chain link fence around his property. Tr. at 11.

Browne discussed the issue with Plaintiff after identifying the problem. Tr. at 15. Browne testified that the substance of the discussion was that "[t]he intent was to move the boundary where the fence — where the fence would have touched the house, out ten feet, and to do the same at the bottom, sort of, you know, equalizing what was taken and what is given. That was the discussion." Tr. at 15. Defendant further testified as to the events in question:

> Attorney Wynter ("Wynter"): Can you tell the Judge what was Mr. Stanley's response to your proposal?
> Defendant: He said it's not a problem.
> Wynter: He said it's not a problem?
> Defendant: Mm-hmm.
> Wynter: Okay. And what date was that?
> Defendant: That was — this was right after Hugo, late '89 or early '90, somewhere around there, because it was after Hugo that I started making the fence.
> Wynter: Now did you ever took steps to get a surveyor to survey the property?
> Defendant: No.
> Wynter: Did you ever reduce your conversation, an agreement as you said, with Mr. Stanley?
> Defendant: Reduce it? When you say —
> Wynter: In writing.

---

[4] No evidence was presented and no reference was made at Trial to the applicable zoning provisions of Title 29 of the Virgin Islands Code, or to the zoning district within which the Property lies, but both parties concurred that the Property is subject to a 10-foot setback requirement.

[5] Plaintiff later stated that Defendant's house is between five to seven feet from Plaintiff's Property boundary at its closest point. Tr. at 56.

Defendant: Reduce it to writing, no.

Wynter: Okay. Did you ever give any compensation to Mr. Stanley?

Defendant: No.

Tr. at 21. Defendant Browne further testified as to his understanding of the agreement under cross-examination by his own attorney:

Attorney Henderson ("Henderson"): Okay. And did Mr. Stanley agree with you, as well as his brother, that that fence can be perpetual, meaning it would be up for as long as it needed to be there?

Defendant: At least that's my understanding.

Henderson: And at no point did Mr. Stanley ever say to you, when you all agreed to erect this fence and follow your recommendation, that he only wanted your fence up there for a time certain.

Defendant: No.

Tr. at 29. Browne then erected the chain link fence, with the help of two other men, with a portion of the fence on Plaintiffs abutting Property, to comply with the ten-foot setback. Tr. at 35-36. Defendant did not pay for the fence, having obtained if for free at the dump, and estimated that he paid the two men who helped him erect the fence $200 for their labor. Tr. at 35.

Plaintiff's brother Kirtly Stanley also testified as to his understanding of the agreement:

Kirtly: Well, the — the problem was, Quinton told me that Eric house was too far over, and they make a verbal agreement, was to give Eric — supposed to give him piece of the land to the bottom and he take use of the top.

Henderson: Okay. And that was your understanding of the agreement between mister — wait, let me finish, between Mr. Stanley, your brother, and Mr. Browne.

Kirtly: Yes.

Henderson: Okay, and this agreement was told to you by Mr. Stanley, your brother.

Kirtly: Both parties.

Henderson: By both of them.

Kirtly: Yes.

Henderson: Okay. And were there any conversations about this agreement between the two of them while you were present? In other words —

Kirtly: No.

Tr. at 46.

Plaintiff Quinton Stanley testified as to the alleged oral agreement thusly:

Plaintiff: I — I gave him permission to temporarily construct a chain-link fence, due to the fact that when he was constructing his house — before he constructed his house, he built a — he built a storeroom on — and half of his tool room was on — on my property, and the agreement — and the agreement was when he finish his house, he would take down the storeroom.

So before he got — to that point, to take down the storeroom, he wanted to construct the fence. So in order to construct the fence, and to secure his property, he — he had to go around his tool room or inside, which is he — he choose to go around it. I — I had no problem with it at the time, because it was a temporary thing.

Wynter: Now, after the fence was constructed, did you and Mr. Eric Browne reach any agreement that was reduced to writing?

Plaintiff: No, sir. In fact — in fact, a couple of time, I asked him when are you going to remove the fence? And he — and he never respond.

Tr. at 59-60.

Based on the testimony of both parties, the Court finds that the oral agreement between the parties permitting Browne to construct the chain link fence on Stanley's adjoining Property did not include any timeframe or duration for which the encroachment would be permitted. Although Defendant testified that it was his "understanding" that the fence line agreement was permanent, and although he stated that he was never told the arrangement was "temporary," he also offered no testimony alleging that Plaintiff understood or ever stated that the arrangement was permanent. He did not testify or present any evidence to explain what led him to believe that the arrangement was permanent, and did not testify

389

that the duration of the agreement was discussed between the two parties, at the time of the agreement or at any point thereafter.[6]

On the other hand, Plaintiff plainly testified that he "gave [Defendant] permission to temporarily construct a chain-link fence." Tr. at 59. The Trial evidence established that the agreement was not the Court concludes that no definite timeframe for the duration of the agreement was included in the parties' oral agreement.

The Court also finds, based on the testimony at Trial, that there would be little cost to Defendant to move the fence back to his own property. In fact, Plaintiff testified that he would remove Defendant's fence, and replace it with his own fence or wall on the correct boundary line at no cost to Defendant.[7] When asked about the estimated cost to remove the fence, Defendant stated that he had "no idea." Tr. at 3.

## DISCUSSION

### I. Defendant's "Rule 50 Motion"

■ After Plaintiff completed the presentation of his evidence at Trial, Defendant made an oral motion for directed verdict on the grounds that "the plaintiff [had not] established the grounds for which he has filed his

---

[6] There was no testimony at Trial, from Plaintiff, Defendant or Kirtley Stanley, that alleged that either party made any reference as to the length of the agreement at the time the agreement was made. Although Defendant repeatedly argued that Plaintiff did not state to Defendant that the fence agreement was "temporary," he offers no argument why the Court should interpret the lack of a specific duration of time should cause the Court to interpret the agreement to be permanent, especially when the overall nature of the agreement was so casual and informal in nature.

[7] From the Trial:

> Wynter: Would it be, from your opinion, costly to move it, or him to move his fence and put it where it belongs?
> Plaintiff: My — I'll say no.
> Wynter: Okay.
> Plaintiff: And if you want — and if you want me to remove it, you know, I'll remove it.
> Wynter: You'll remove it for him?
> Plaintiff: Free of cost.
> Wynter: Okay.
> Plaintiff: Just want my property.
> Wynter: And then you would put up your own fence?
> Plaintiff: Yes, sir.

Tr. at 102.

petition." Tr. at 104. Although Defendant chose not to file a post-trial brief, he argued at Trial that "[t]here's been nothing before the Court to clearly indicate through expert testimony that there has been a boundary departure." Tr. at 105. However, based on the testimony quoted above, both parties clearly testified that a boundary departure had taken place. The encroachment of Defendant's fence onto Plaintiff's adjoining Property was never a fact in dispute. Defendant has offered no reason why expert testimony is required to establish an issue that is not disputed and on which both parties agree. Defendant's "Rule 50 Motion" will be denied.[8]

## II. Plaintiff could not orally grant Defendant a permanent interest in Plaintiffs real property

■ The Statute of Frauds, codified in the Virgin Islands at V.I. CODE ANN tit. 28, § 241(a), requires that the conveyance of any interest in real

---

[8] A point of confusion at Trial was whether the central issue of this case is a land swap by the parties, thereby changing the boundaries of each party's property, or whether the agreement only concerned the right of Defendant to place his fence on Plaintiff's Property. The Court attempted to make a distinction between any issue about the placement of the fence and the location of the boundary during the Trial:

> The Court: Excuse me. You say move the boundary. There's been testimony already that there was no surveyor brought in, so I'm not clear when you say move —
> Henderson: Well, when I say — I'm talking about the fact that the plaintiffs have argued that mister — that the fence is on their boundary. So assuming that it is on Mr. Stanley's property, I'm asking, based on his agreement, whether or not that fence, or that boundary, ever had been moved within the ten feet that they agreed to.
> The Court: So when you say —
> Henderson: Not necessarily that — that anything officially has been moved, or entered into, to show that, but that, based on their agreement, had that issue been moved over ten feet.
> The Court: Okay. And are you — is the construction of the fence a part of your question, or are you equating movement of the boundary as being the same as construction of the fence?
> Mr. Henderson: No, no. It's two separate things.
> The Court: Okay.

Tr. at 26-27. Defendant's assertion at Trial that the boundary and the fence are distinctly different; and Defendant's Counterclaim alleging only breach of the oral "contract" that Defendant "would erect a permanent wall which would have been on Plaintiff/Counterclaim Defendant's property" suggest that the sole disputed issue in this case relates to the alleged agreement concerning the placement of a fence by Defendant on Plaintiff's Property, not to any actual land transfer between the parties, or a dispute about the property boundary line. *See* Defendant's Answer and Counterclaim, at 2.

property, outside of a lease for no more than one year, must be in writing. As made clear by all parties in this action, no part of the alleged agreement was ever in writing. Therefore, even if the Court had found that Plaintiff and Defendant had made an oral agreement granting Defendant the right to permanently place his fence on Plaintiff's Property, the agreement would be unenforceable and void or voidable.[9] *See Fountain Valley Corp. v. Wells*, 19 V.I. 607 (D.V.1.1983), *aff'd*, 728 F.2d 209 (3d Cir. 1984).

██ ██ Therefore, because the agreement was oral and without a specified period of time, the Court finds that Plaintiff granted Defendant a revocable license to place his fence on Plaintiff's Property, which license was revoked when Plaintiff demanded that Defendant remove the portion of the fence that encroached onto Plaintiff's land. *See Felker v. Stewart Title Guar. Co.*, 1998 U.S. Dist. LEXIS 17937, at *19 (M.D. Pa. Mar. 30,1998) (stating that a license is where possession remains in the licensor and the licensee has a mere privilege of being on the land without being treated as a trespasser, and further, that a license is generally revocable).

### III. Defendant's equitable estoppel theory

██ ██ Defendant made no legal argument identifying what property right Plaintiff granted Defendant by their oral agreement. Instead, Defendant's primary legal argument at Trial was that Plaintiff's claim should be denied based on an equitable estoppel theory. Tr. at 105, 112-16. Defendant cited *Gov't Guar. Fund of Fin. v. Hyatt Corp.*, 955 F. Supp. 441, 35 V.I. 356 (D.V.I. 1997) for the general rule governing equitable estoppel:

> The first element of equitable estoppel is a representation of some kind made by the party to be estopped which often consists of some verbal statement that something is true or not true contrary to the actual facts and the estopped party's later claim. The second element is an intention or expectation that one's conduct shall be acted upon by, or influence, the party seeking estoppel. The third element is full knowledge by the party sought to be estopped of the true facts at the time of

---

[9] Plaintiff's Post-Trial Brief argues that Plaintiff granted Defendant a revocable license/easement. Plaintiff's Post-Trial Memorandum, at 1.

the representation. Finally, the party claiming estoppel must have, as a result of the other party's conduct, acted or failed to act so that his position was changed in such a way that he will suffer injury if the other party is not estopped, and the party claiming estoppel must not have had knowledge of the misrepresented facts.

*Gov't Guar. Fund of Fin. v. Hyatt Corp.*, 35 V.I. at 381 (internal quotations and citations omitted).[10]

■ The most glaring shortcoming in Defendant's reliance upon an equitable estoppel theory is his failure to show any substantial reliance or any injury. As to reliance, Defendant does not allege that any agreement took place until after his home was built.[11] Therefore, the only "reliance" on the agreement that Defendant acted upon resulted in him erecting a fence, which he obtained at no cost, and his payment of $200 for labor to erect the fence. That fence has now stood for roughly 25 years. Only a portion of the fence encroaches onto Plaintiff's Property and only that portion would have to be removed or relocated. Therefore, Defendant's insistence that he substantially "relied" on the alleged agreement is unsupported by the record.

Defendant's claim as to any injury he may suffer if faced with an order to remove the fence is also lacking. Defendant's counsel argued that "[w]hen [Defendant] relied on the fact that Mr. Stanley would give him that ten — that ten feet buffer zone, that then would obviate the issue of the Department of Planning and Natural Resources ("DPNR") coming to

---

[10] The United States Supreme Court has stated that "a hallmark of the [equitable estoppel] doctrine is its flexible application . . ." and that "the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler v. Community Health Servs.*, 467 U.S. 51, 59, 104 S. Ct. 2218, 81 L. Ed. 2d 42 (1984) (internal quotations and citations omitted). The record reflects that the only "change in position" that Defendant took based on his interpretation of the agreement is the placement of the fence, which only amounted to a deviation from the boundary by a few feet, over a relatively small portion of fence line.

[11] The testimony of all parties supports this sequence of events, as does the argument of Defendant's attorney, who stated at Trial that "the house was built and close on the boundary. Mr. Browne then discovered that issue and brought it to the attention of Mr. Stanley." Tr. at 115. Defendant's counsel then seemingly contradicted himself and the testimony of all parties, stating that "[t]he damages in this case, Your Honor, speak specifically to the fact that Mr. Browne has relied on where that fence is for purposes of his home." Tr. at 115.

an — coming in there to create any issues for him or fine him." Tr. at 116. But Defendant has not argued that a valid property transfer has taken place and that he is now the owner of that portion of Plaintiff's land required to give him the proper 10-foot setback from the boundary with Plaintiff's Property. He argues only that he has an agreement to permit his fence to encroach onto Plaintiff's Property. But, whether the fence is allowed or not, Defendant remains in violation of the 10-foot setback requirement, as the setback requirement relates to the boundary line, not to the placement of any fence. Therefore, any issue raised over any possible future action by DPNR over Defendant's misplacement of his own home is irrelevant to the only issue before the Court, whether there was a temporary or permanent agreement as to the placement of that fence by Defendant on Plaintiff's Property, and the enforceability of that agreement.[12]

## IV. Defendant's Counterclaim

Defendant's Counterclaim alleges breach of contract in that "eleven years after the agreement to erect the permanent wall, [Stanley] demanded that [Browne] remove the wall. [Stanley's] conduct in demanding the removal was a breach of the oral agreement. As a result of [Stanley's] actions, [Browne] has sustained economic damages." Defendant's Answer and Counterclaim, at 3.

■ As stated above, 28 V.I.C. § 241 requires that any agreement granting Defendant an interest in Plaintiff's Property must have been in writing to be effective. Defendant admitted that the agreement was never reduced to writing. Therefore, no enforceable "contract" was created and Defendant's claim is without merit. Further, Browne at no time offered any evidence of "economic damages" resulting from Stanley's demand for the removal or relocation of the encroaching portion of the fence on his Property. No evidence was presented at Trial and no legal theory offered giving credence to the claim that Stanley breached the parties' oral agreement by demanding that Browne remove the fence from his Property. Therefore Defendant's Counterclaim will be dismissed with prejudice.

---

[12] Defendant testified that he has never been contacted by DPNR about his apparent violation of the 10-foot setback requirement. Tr. at 36.

394

**CONCLUSION**

Roughly twenty-five years ago, two neighbors made a vague oral agreement that one could erect a chain-link fence, a portion of which would encroach on the other's land. Nothing was put in writing and the duration of the permitted encroachment was never discussed. Plaintiff, the neighbor whose land is being encroached upon, now seeks judgment requiring the removal of that portion of the fence that encroaches onto his Property. The removal or relocation of this portion of fence will cause no substantial injury to Defendant. Therefore, the Court will enter judgment ordering Defendant to remove any and portions of his fence encroaching onto Plaintiff's Property.

A Judgment Order consistent with this Memorandum Opinion will issue herewith.